When you're ready, Mr. Hoppe. At Police Court, my name is James Hoppe, representing the real party of interest in this case of Dow Chemical Company. There's three topics I wanted to talk about, three reasons for reversing the board in this case. The first being that the prime facial case, with respect to the amount of the first component in this case, was not met because there was no overlap in the claims and the prior art versus the claims, or the teaching in the prior art versus the claim. Our claim recited that the first component was going to be present an amount of 26 percent, whereas the prior art, the Moggins case, had said 0.5 to 25 percent. Can you focus, I know you've got another issue too, but this is what I want to focus on first. Column 12, lines 41 through 59, that's essentially the whole argument that the government makes with respect to why they believe that this Moggins reference made Moggins' own limitation of up to 25 percent meaningless, I guess. In other words, it didn't have to do that limitation because it could have been up to 100 percent weight, presumably. And you're referring to column 12 of the Moggins Act? Yes. And this line? Line 41 down to 59. Okay. Actually, in this section that you're referring to there, to me it kind of teaches away, that's sort of a second argument, because it tells that what happens if you do add the first component. I mean, in the sections that you refer to, talking about balance, that if you have the addition of this first component, that the goal is that you're not going to harm these properties by more than 80 percent, or preferably no more than 80 percent is the most preferred range. Okay. So it's teaching, in that case, that hey, if you add that first component, a person of ordinary skill in the arts is going to understand that the first component has an effect on the fabric strength or upon the spin ability. Right. And you point out in column two that they basically say you don't want to go too heavy because it's going to hurt the spin ability. I guess what I'm trying to understand is why did Moggins contain a limitation? Is it clear in the Moggins spec, or do you know if it's anywhere in the file wrapper for that prior art as to why they limited it? They believe it would hurt those properties. They believe it would hurt the spin ability. They believe it would hurt the fabric strength. And that's what it says, is that while this stuff is good for bonding and why it's good for some elasticity, it has these other effects. And that's why they put a limitation on it. They thought that if you would go higher than 25 percent, it wouldn't work. So you don't think that above 25 percent is something that was essentially disclosed but not claimed in Moggins? Right. I think the implication, when you say that the goal is to have fabric strength, which is at least 20 percent of what it would be without the component A, I think it's a pretty clear implication that there's a reason you don't want to go too much, and they decided that too much was 25 percent. That's what they claimed. Do you know if there's anything else in what was art prior to Moggins that would have had a higher range? Quite honestly, I don't. It wasn't part of the case in the facts for this case. Okay. Okay, go on. Okay. So, yeah, the first part of the argument, though, is whether, as a matter of law, a prior art range which has no overlap, no continuation with the claimed range can support a prima facie case of obviousness. You need to address, perhaps, the titanium metal site where it says a prima facie case exists where the claimed ranges in prior art do not overlap but are close enough. Right. And when you look at the titanium metals case, and specifically, there was points. What the claim was, it said 0.8 percent nickel, 0.3 percent molybdenum, optional component balanced titanium. The prior art had two specific examples. One was at 0.75 and one was at 0.94. The claim was at 0.8, right in the middle of those two points. So, while it's not expressly stated as a range, a person of ordinary skill in the art looking at those two points would think, all right, something in the middle would work, too. There's no reason to think that you would disregard those two points. And the same with the molybdenum. 0.3 was the claim. The example was at 0.25 and 0.31, one below, one above. So, again, that's really a case of overlapping ranges, just with a little bit of filling in the blanks, I guess. But the whole point, of course, is that somebody of skill in the art would say that's close enough that they're going to have the same properties. Why isn't that the same thing here? As you answered to Judge O'Malley, the prior art and this reference and this application are seeking to achieve the same goals, and you come within 0.25 to 0.26. Why wouldn't one of skill in the art know they're likely to have the same properties? One way, you talked about the teaching away, when it says that, hey, if you add the first component, you're going to hurt the spendability, you're going to hurt the bond strength. So in this specific case, you had that specific teaching. But you're only one away. Is moving one click to the south going to change the property that much? If this case, hypothetically speaking, had said, in the absence of, we're claiming a known first component, and we had said you have to have at least 1% of that first component, is there any doubt that that wouldn't be a prima facie case? So are we saying that the 0 to 1% is more significant than 25 to 26? And again, this is the prima facie showing. This is without any arguments that the examiner might have brought in. This is just saying on its face, 0.5 to 25 should be the same as 26 to 80. So there's no expert testimony or other indication that a person of skill in the art would see a difference between 25 and 26, right? Right, that's correct. We didn't feel it was necessary given the fact that the examiner's contention that 25 and 26 were the same was supported by case law or supported by anything in the art that they had cited to. Right, because there's nothing in our case law that says that ranges that don't overlap would automatically support a prima facie case. Right. In the cases that were cited for supporting that they can be close, that they don't have to be within the same range, when you look at the underlying facts, they can all be distinguished. The closest one to being on point was Emery Woodruff, which claimed 1 to 5% of the CO for the bags protecting produce, and the prior art has said 1 to 5. But even in that case, you form a continuous range, 1 to 5 up to greater than 5 to 25, there's no gap in between. So you're moving exactly from one to the other. To me, it seems like having a gap is the old proverbial slippery slope. Is 1% enough? Is 2%? If you allow 1% in this case and the next one comes along, it's 2%, well, it's only 1% more. There's the case law that was cited. Isn't it the slippery slope the other way too? You can take it out multiple decimal points. There's always going to be a slight gap if you're trying to claim around a certain patent. If it said 24.99999, you could go 25.000. At some level, that gap is going to be insignificant, isn't it? I think you're right that it probably isn't if you take out enough decimal points. In this case, it's not the case. In Woodruff, it was not the case. They said greater than 5, which mathematically is 5 amounts of decimal points. I suppose your argument would also be that at some point, the examiner has to explain why the gap is or isn't significant. Right, by just saying without anything more. Let's turn to your density argument for a minute before your time runs out. I don't understand how, even if we accepted the proposition that you were showing unexpected results for one point, how could showing unexpected results for one point in a range cover the entirety of the range? I guess my basic problem with this case facts in that regard is the examiner never gave any substantive arguments. If they had said, hey look, it's only one point, you need more than that to show that that one point makes a line, maybe this is a curve. If they had said there was other examples that didn't look quite as good, if they had said that you can't extrapolate for the whole range based on one point, all those things could have been addressed. All the examiner said in this case was that overlapping ranges cannot be ignored. Our point is we didn't ignore it. We presented this evidence. We presented two points. All these things that you're talking about, we could have had that substantive argument back and forth. We could have presented data, but we were never given the opportunity to meaningfully respond to the examiner. But this isn't one of those cases where the prior art shows a broad range and someone is able to establish that there is a narrower range within that that has unexpected results. You're trying to claim a whole range and you can only give us one point with an unexpected result. Well, the range that we claimed was .95 and essentially above. What the prior art had said was .85 all the way down to .85 to .95. So we're getting rid of the .85 all the way up to .914 or whatever. What we showed was a comparative example versus the example of the invention where there were two differences. One was the amount, which we explained that the amount actually helps or would hurt us in that case, and the density, and the density was slightly changed. What we intended by that was to show that it's a trend and that higher densities give better abrasion properties. So we did not show more than one point. And, again, if the examiner had come back and said that's only one point, you need to show something more than that. But all they said was that the overlapping ranges cannot be ignored. I'd like to reserve the time for me. Thank you. Ms. Stewart? Thank you. May it please the Court. Just to put this case in a little bit of context, I think it's an important example of a problem that's repeatedly happening before the office, which is you have applicants looking at patented inventions  that explicitly hasn't been included in the patent. And we have 60-plus years of case law that says, in such a situation as that, that's fine. You can take another patent. You can dissect it and claim something that isn't specifically inside it. But then you have to explain why your small shift in the amount or the range or whatever the case may be renders your patent,  that's been the framework that's been in place for decade after decade. And that's just something that hasn't happened here. Counsel, I think, made a misstatement of the law when he said the examiner has to explain why his rationale for saying that the overlap somehow establishes a prima facie case. And the examiner does not have to explain that. Well, we don't have an overlap on the weight. You can see that. We do not have an overlap on the weight. But the Aller case is clear that an overlap isn't required. And in the Aller case, it wasn't just dealing with specific points. It was dealing with ranges. I believe in that case... That's because they abut it, right? None of the cases that you cite actually have a gap. Yes, they do have gaps. In Aller, for example, this is a case from 1955. The required temperature in the claimed invention was 40 to 80 degrees. And the prior art taught a temperature of 100 degrees. In the acid concentration, this is a process for the production of a specific chemical, the acid concentration in the claimed invention was 25 to 70 percent. And the acid concentration in the prior art was 10 percent. Much farther away than the situation we're dealing with here. So what Aller basically said... And also, I would point out, in titanium metals, they weren't abutting as well. But in titanium metals, it's a very different concept than just ranges. Those were points, and the point at issue was between two other points, correct? Well, I think it's true. In titanium metals, we were dealing with points. And I think that Judge Hughes made an excellent observation, which is when you're dealing with science and mathematics, points can be brought out towards infinity. So if you're dealing with something that's saying 0.8 versus 0.75, I think someone could argue there's a gap there. But part of my problem, though, is that if you look at Moggins, it clearly claims up to an upper limit. And then all the dependent claims, to the extent they claim anything else, claim something even lower than that. And it talks about the importance of not going too high on the weight because you're going to ruin spinability. Even if that's not teaching away, how is it that you can say that on its face that it constitutes a reference that would make any other range obvious? I mean, we'd have to assume that they made that limiting claim themselves when they didn't have to, for no reason. Well, you know, here I think you're dealing with very broad numbers. I mean, you're talking about the preparation of very sophisticated chemicals. And they're saying anywhere between 0.5% and 25% is okay. And then they make some general statement that, by the way, you want to be sent into the fact that at a certain point, they didn't say after 25, they said at some certain point, if you keep adding in this other component, it may have some detrimental effects down the line. They said preferably you want to keep it under 25. No, they did not say that. They did not. They did not mention the 25%. They just claimed 25%, as Judge Rader said in the first argument today. Well, they claimed 25%, but then they separately claimed 15%, and they also talk about 10%. But they never say that anything over 25 would yield the invention. Correct. I mean, I agree with Your Honor. I think my only point was they didn't explicitly say going over 25% was a problem, but you're correct. They did not claim anything over 25%. And I think a really instructive case with respect to this range is the Geisler case. In that instance, you're dealing with angstroms, which, you know, I looked up because I didn't know the answer to this, and an angstrom is one-tenth of a billionth of a meter. And in that case, the prior art said you shouldn't go under 100 angstroms. Still, this court found that that was not a teaching away. And it's a very similar case to the situation where the patent holder said, hey, we went all the way down to 50 angstroms, and we were getting good results. And that's totally counterintuitive because you're talking about a protective layer that's being put on top of material. And the thinner the layer is going to be, one would assume the less protection you're going to get. And this court said that is not a teaching away. You can't rely on attorney argument and common sense to extrapolate, you know, a statement like that. You've got to put forth evidence that, you know, there's some linear relationship. So I think that counsel does make some points which have some intuitive appeal, but he's arguing against, you know, a mountain of case law basically against his position, you know, starting, you know, basically in the early part of the 20th century. And I think that this case certainly doesn't warrant being distinguished from those. Not only, you know, are we dealing with a situation where, I guess what I'm trying to say is in this case we're dealing with two compounds, and the compounds themselves are very similar. You know, I was trying to think of an example because I have a 10-year-old son, so I was trying to think of an example to compare with him, and I thought of two examples. You know, let's say you have a glass of water with a drop of Clorox. That's obviously a very different situation than a glass of Clorox with a drop of water. You cannot say that the general conditions are met, even though the ranges might be, you know, 1 to 99, or 0 to 99, and 1% at either end. But here we're not dealing with an extreme example like that. We're dealing basically with two types of polymers that even if you look in the face of the patent are very, very similar. So I think a better analogy would be, you know, one type of Clorox mixes another type of Clorox, or one type of water mixes another type of water. And so what the patent office says to an applicant in that circumstance, okay, that's fine. You can file that application with our office, but please explain to us why your range or your point or your distinguishing feature separates it from something that we already have as patented. Should we be looking at the expanse of the range instead of just the end points as the board did? I think the expanse of the range is relevant because I think what it shows is there isn't criticality here. I mean, if you can go anywhere from 26% all the way up to 80, and in some examples in their specifications as low as 10 up to 90, then you're not talking about some minor tweak to this composition that's going to have really significant results. And I think if you could show a difference, we wouldn't be standing here today arguing about whether or not the prima facie case was met. I think they'd be saying, hey, you know, we've got some really special stuff going on here. When you add more than 25% of this polymer and years of prosecution for the agency, they haven't put any evidence on with respect to the importance of their claimed upper end of the range. But where I'm getting a little bit hung up is, I mean, the burden is on you to provide a prima facie case of obviousness, and all I see is that the range is abut. Is there anything more than that? Well, I agree with your honor that our burden is to show the prima facie case. That seems to be a really hard general rule to apply. It may be that in this case, because of the similarity of the polymers and stuff, that's enough. Nobody explained that, I don't think. But in certain other cases, it may be because of the way chemicals interact or things like that. You know, if you go from 25 to 26%, it produces a dramatically different result. And I know you're saying that they could come back and explain that, but isn't in this case, it's your burden to make a prima facie case of obviousness. And we can't just apply some kind of presumption that since they abut, it's obvious. Well, I agree with your honor that it is our burden, but I think that what the Aller case is saying is that when the general conditions are met, that burden has been met and the burden shifts. I mean, that's why we have these kinds of judicial rules of thumb. And I think also Judge Rader addressed this point in the Antwerp media case, which is the PTO doesn't have laboratories where they can conduct their own experiments. We need these kinds of procedural tools. But in Antwerp, we didn't say that the PTO can be completely relieved of its burden to show a prima facie case when it's obvious that this is an issue. Right. But if you look at, for example, claim one of this application and claim one of the prior art, they are word for word almost identical. I mean, so you're dealing with a situation where you have one claim here and one claim here that are written in the same form, that use the exact same components, that are for the exact same product for the exact same purpose. But the problem is that if you took this concept, I mean, even a small gap in ranges, say in a pharmaceutical compound, could be huge, could mean a lot. All the board said here was just because, even though there's a gap, they end up getting close, that that's enough and that's the end of the inquiry. In fact, it was a presumption of obviousness. But that can't be the rule. Well, I respectfully disagree with your Honor, because I think that precisely can and should be the rule. Again, we don't have a lot underpinning this art, but what if the record showed that the range was from 26 to 80 in the prior art, but in fact, all the work was at 75 and 70, and they had just claimed down to 26 kind of as an extra caution. And there had really been an advance, where somebody had learned how to do it at 25, and that it had produced significantly beneficial criteria. In that instance, you'd probably say to me, Oh, that's not prima facie obvious, right? I'm changing the facts, I understand, I'm building a different hypothetical. But where there's the range in the prior art, is really practiced at the upper end, and so forth with my hypothetical. Wouldn't you in that sense say, no prima facie case there? Well, I think if I understand your hypothetical, you're dealing with a situation where someone's claiming a very broad range, The prior art, no, the prior art's the broad range, but the prior art's all being practiced at the top end of that range, and anyone of skill in the art would say, Wow, they found out how to do it at 25, and get those properties, that's tremendous. Would that change? I think that might change the evaluation. I think it would too, and that being the case, does Judge O'Malley's point make a lot of sense, that because there's a possibility here, maybe we have to put a higher burden on the office to make sure that possibility is not happening. Well, I appreciate that, and I wanted to address Judge O'Malley's point, because I actually think the more extreme the hypothetical, then the easier the case is going to be for the applicant to come back and rebut the prima facie case. But that sounds like you're flipping the burden in these range cases. I mean, it sounds like you're saying in any kind of range case, if it's close enough, then it's going to be the applicant's burden to show it's not obvious, and we don't have to do anything more than say, range is close, that's good. Well, we're not going that far, Your Honor, because as the example I gave about the glass with a drop of Clorox versus the glass with Clorox with a drop of water, I think you can fairly say there that the general conditions are not met. You're dealing with two totally different... But how do we know that's the case if you don't say anything more? Because here you didn't say anything more. It could very well be, because you've given us very good examples today of argument about why these polymers are very similar, and it may not have the same kind of dramatic consequences you might have in a chemical case. But the examiner didn't say anything about that. I think the examiner did say that. I mean, the examiner, he has three office actions in this case, and in the office action, he specifically walks through the prior art and says, you know, I'm going to look at... We look at this prior art, which, by the way, is owned by the same company, the Dow Temple Company, and, you know, it exhibits all of these similar characteristics. And he basically spent, you know, several paragraphs and pages, ultimately, comparing the prior art with the application and discussing their similarities. So he didn't just leap right in to saying, you know, I've got one nonwoven fabric and I've got another, and now, you know, your turn. He really did look at, you know, compare them. I'm not hearing anything specific about where the examiner talked about the ranges and why they were similar or not, to render it obvious. Well, I agree with you there that the examiner didn't get into the specific details of discussing the ranges and why they were obvious based on some scientific evaluation. But I think what he did, the examiner clearly met his burden of saying that the general conditions are met, and that's what's required. Did the examiner at any point say 25 and 26? That's likely to have the same properties. Well, he came close to saying that because he said repeatedly, for example, I'm just looking at page A125, which is the first office action. The examiner says he didn't see a patently distinguishable difference between 25 and 26 weight percent. And I note that never throughout the entire history of this case has applicants said, oh, we can show a difference, but we've been denied that opportunity. Counsel did suggest that a little bit today, that maybe they could have done it. But it's the office's belief that they're hinging on this procedural argument because, as they say in their blue brief, if we can't show the prima facie case, they get their patent. I mean, that's how they want it to come out. And that's why we have these general principles, you know, that the office has been operating under, you know, for 60 years, saying that that's not appropriate. I would like to point out a few other points quickly. I think that it's very hard to follow the comparative examples 11 and 17 that they point to to distinguish, you know, to show that their density is better. But I would like to point out that if you or your law clerk spent a minute looking at the examples, it is completely apples to oranges. I mean, not only is the amount of the polymer different by 5%, which they concede before the office, but if you take a look at their chart, the bonding temperature used between those two examples are different. The melt index used between the two properties are different. The second component and both of the examples are completely different components. And the alleged improvement in abrasion performance is only 15%. So, you know, I think in a situation like this, it's not surprising that the examiner and the board said that they didn't find the particular evidence compelling, because it's one point, it's not commensurate with the scope of the claims, and even the applicant admits that they are not isolating the critical variable, which is density. Thank you, Ms. Stewart. Thank you, Your Honor. Mr. Hoffman. I've been looking here at several passages, but let me just pick one. The examiner maintains that a patently distinguishable difference between 25 and 26 does not exist. As such, it would have been obvious. The examiner seems to have actually said a person of ordinary skill would not see a difference here. And a couple of things with that. One, we are talking about the whole range of 26 to 80, not just the lower end points. Two, the teaching, what would a person of ordinary skill in the art understand from the Moggins reference? It teaches that it has this negative effect, and they claimed 0.5 to 25. They thought, and they being us, it is another Dow Chemical case, but at the time, we thought that it couldn't go higher than 25. There's a reason why you restrict your claims to that amount when it's not based on priority. This is based on what we thought worked at the time. So when you say that the broad range we're claiming now, 26 to 80, shows that that amount is not critical, that's what we discovered. What would a person of ordinary skill in the art looking at this case see from that, and what would they determine? Would they look at that case and say, oh, there's no way 25 is critical, I'm going to go above it? If they would look at it and say, well, for whatever reason, including the reasons that they talked about, about having problems with spinability and problems with the strength of the fabric, they saw that, and they thought they'd limited themselves to 25%. Why would a person of ordinary skill in the art look at that and think anything different? I did also want to talk about the Henry Aller case that the solicitor brought up. And really, when you look at the facts of that case, there's broad teachings there too. It taught at elevated temperature, and it taught in the presence of acid. Those were the broad teachings. The specific example was outside the scope of the claimed range, but the teachings and what that taught to the person of ordinary skill in the art was broader than that specific example. Any other questions? All right, thank you, Mr. McCarthy. Thank you very much. And I think that concludes our morning. All rise. The court is adjourned until 12.30 at 10 o'clock.